**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**Case No. 9:12-cv-80135-Marra/Vitunac**


RICHARD CLYDE ALTHOUSE,

        Plaintiff,

vs.

PALM BEACH COUNTY SHERIFF'S
OFFICE,

        Defendant.

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## (AND MEMORANDUM OF LAW)[1]

The Defendant, PALM BEACH COUNTY SHERIFF'S OFFICE (Ric L. Bradshaw, in his official capacity as Sheriff of Palm Beach County, Florida), by and through his undersigned counsel, hereby files this his Motion for Summary Judgment (and Memorandum of Law), pursuant to Rule 56 of the Federal Rules of Civil Procedure, and as grounds therefore would state as follows:

The Plaintiff is proceeding pro se in this case as a free citizen who is not incarcerated in the Palm Beach County Jail.  Plaintiff alleges that his federal and state constitutional rights to communicate by mail with inmates in the county jail has been violated as the result of the implementation of the Sheriff's Office's incoming "postcard only"

---

[1]The Defendant's Motion, Statement of Facts and Memorandum of Law are incorporated into one document for convenience.  The Defendant's Statement of Facts does not exceed ten pages.  The Defendant's Memorandum of Law does not exceed twenty pages.  <u>See</u> Local Rules 7.1 and 56.1.

inmate mail policy. [DE 1-Notice of Removal-Exhibit "A" Complaint.][2] Plaintiff seeks a declaratory judgment and an injunction asking the Court to declare the policy unconstitutional and to enjoin its enforcement. [DE 1–Notice of Removal–Exhibit "A" Complaint.]

The Defendant Sheriff filed his Answer and Affirmative Defenses to the Plaintiff's Complaint on September 27, 2012. [DE 21].

Based upon the pleadings, the record evidence and the exhibits filed in support of this Motion for Summary Judgment, and as referenced herein, it is shown that there is no genuine issue as to any material fact regarding Plaintiff's claims as against the Defendant Sheriff, therefore the Defendant is entitled to summary judgment as a matter of law.

WHEREFORE, it is respectfully requested that this Honorable Court grant the Defendant PALM BEACH COUNTY SHERIFF'S OFFICE's (Ric L. Bradshaw, in his official capacity as Sheriff of Palm Beach County, Florida) Motion for Summary Judgment.

Further, and in support of this motion, the Defendant PALM BEACH COUNTY SHERIFF'S OFFICE (Ric L. Bradshaw, in his official capacity as Sheriff of Palm Beach County, Florida) would refer this Honorable Court to the Memorandum of Law attached hereto and by reference made a part hereof.

---

[2]Plaintiff alleges in paragraph 17 of his Complaint that he has had letters in envelopes sent to inmates returned as undeliverable due to the postcard only policy.  Plaintiff did not identify the inmates he sent the letters to.

## STATEMENT OF FACTS

1.      On September 19, 2011, the Sheriff of Palm Beach County implemented a

corrections operating procedure, COP #929.00, which reads in pertinent part as follows:

**Palm Beach County Sheriff's Office
Corrections Operating Procedure**

**SUBJECT: Inmate Correspondence                    C.O.P.#   929.00
Mail**

...

**III.     DISCUSSION:** All inmates are encouraged to maintain ties with their families
and friends.  There is no limitation on the volume of lawful mail, except for
packages and publications, certain content or source of the mail, or when
such limitations are necessary to protect public safety or facility order and
security.  All inmate mail entering or leaving the facility shall be processed by
the facility's designated mail personnel.

...

**V.      PROCEDURES:**

A.      Incoming Mail – All incoming mail, except legal mail and other
specially approved items, must be in postcard form.

1.      Acceptable Postcard Forms
    a.      Postcards minimum size requirements are 3.5 inches by
5 inches (as determined by USPS regulations).
    b.      Postcards maximum allowable size is 4.25 inches by 6
inches (as determined by USPS regulations).
    c.      Postcards must be solid color – no photos, art, or
graphic designs.
    d.      Must be written or typed in black or blue ink only.

...

3.      Monies may be mailed to inmates in an envelope addressed to
the inmate's approved mailing address and must state the
inmate's booked name and jacket number.  CASH WILL NOT
BE ACCEPTED.  Any correspondence included with checks,
money orders, or otherwise approved mail, will not be delivered
to inmates.  Monies must be in one of the following forms:
    a.      Money Orders
    b.      Checks from government agencies
    c.      Checks from privately run jails or prisons payable in

3

U.S. Funds.  **...**

    B.    Privileged Mail – Inmates are permitted to send sealed letters to a specified group of persons and organizations, such as courts, counsel, officials of the confining authority, state and local chief executives, administrators of grievance systems, and members of the paroling authority.  Staff, in the presence of the inmate, may be allowed to inspect the outgoing privileged mail for contraband before it is sealed.  Mail to inmates from this specified group of persons and organizations may be opened only to inspect for contraband and only in the presence of the inmate, unless waived in writing, or in circumstances which may indicate contamination.  **...**

See Exhibit "A" - C.O.P. 929.00 and Inmate Mail Notice.

    2.    The Palm Beach County detention facilities house approximately 3000 inmates. The property section of the jail is held accountable for the proper acceptance, storage and releasing of inmate's personal property. The property section also initiates inmate's accounts, makes deposits and withdrawals, and processes funds for release while maintaining accurate records and ledgers for all financial transactions. The property section also processes all inmate incoming and outgoing mail including privileged correspondence. [See Exhibit "B" - Affidavit of Michelle DeLaura.]

    3.    All incoming inmate mail is reviewed to insure it is properly addressed so the recipient can be appropriately identified.  All incoming mail is opened, inspected, and monitored to insure there is no contraband, which includes illegal substances, contained in the mail. The mail is monitored for encoded messages, gang affiliations, criminal activity, security threats, and any other material which may disrupt the facility and pose a potential threat to security.  Privileged correspondence is opened and inspected in the presence of the inmate. [See Exhibit "B".]

    4.    All outgoing mail, except privileged correspondence, must be sent to the mail

4

room for processing unsealed.  Once the outgoing mail is reviewed and inspected for plans to escape, plans of violence, threats to others, and any other material which poses a potential threat to security and others, the mail is sealed and brought to the US Post Office. [See Exhibit "B".]

5.      There are generally four (4) Correction Support Personnel assigned to process inmate mail.   During the years 2008, 2009, 2010, and 2011 the mail room processed approximately 11,000 letters monthly.   The Sheriff's Office implemented a "postcard only" policy on September 19, 2011 [see Exhibit "A"], which has greatly reduced the number of letters in envelopes that are being processed.  The new policy restricts the use of envelopes for non-privileged incoming mail only allowing money orders to be mailed using an envelope.  Otherwise, general, non-privileged correspondence must be sent into the facility using a postcard that conforms to the policy. [See Exhibit "B".]

6.      The postcard only policy was implemented as a method to address the daily concerns of receiving potentially dangerous and hazardous materials in the mail through the use of an envelope.  The property section was continually receiving greeting cards contained in envelopes that consisted of multiple layered parts. Senders placed drugs, tobacco, money, and other contraband items between the layers of the card and glued the layers together in an attempt to conceal the hazardous items within an envelope.  It was also common for the mail staff to discover drugs and drug paraphernalia concealed in the seams of an envelope.  Often, senders would include a small stack of multiple page letters in an envelope where they would hide contraband between the pages. There have been numerous incidences where drugs, tobacco, money, metal pins, and other dangerous contraband have been located while opening and inspecting letters arriving in envelopes.

5

These types of incidents have occurred and still occur through the use of fake legal mail as legal mail can be sent into the facility in an envelope.  Fire Rescue has responded to a number of suspicious white powder incidences that occurred while opening incoming mail envelopes.  The occurrence of a chemical biological incident (white powder incident) results in a facility shut down and all inmate movement ceases. This affects the inmates, the staff, the general public, the court system, and every other entity associated with the detention facility.  [See Exhibit "B".]

7.     Since the implementation of the postcard only incoming general mail policy, the number of incidences involving attempts to introduce contraband into the facility by way of an envelope containing cards or multiple pieces of paper has greatly diminished. However, even the limitation regarding the use of a postcard for incoming general, non-privileged mail has not prevented all attempts to introduce contraband into the facility.  [See Exhibit "B".]

8.     A review of records regularly generated and maintained by jail staff reveals the following examples, which are not exhaustive, of security problems related to incoming mail.

06/05/2008   2.1 Grams of suspected marijuana was found hidden in an incoming anniversary card.

06/09/2008   1.7 grams of marijuana was found in an incoming anniversary card.

04/23/2009   Staff found a letter addressed to inmate Daniel Foster to have what appeared to be marijuana concealed in the envelope.

05/21/2009   Money, notebook paper and a torn envelope were mailed in.

06/12/2009   Staff found marijuana in fake incoming legal mail.

06/15/2009   Mail-Property: Staff found the following belonging to inmate Dartavious Fowler: 2 brown pills, 3 white pills, 6 white pills and 1 crumbled piece of paper.

07/01/2009   While processing incoming mail, staff discovered an envelope containing marijuana (79.6 grams) concealed within.

07/01/2009   While processing incoming mail, staff discovered an envelope with a greeting card which contained 73.3 grams of marijuana within it.

07/10/2009   While sorting inmate mail, staff found a greeting card containing suspected marijuana.

08/13/2009   An envelope containing a card and suspected marijuana concealed inside was confiscated from inmate mail.

10/02/2009   Staff found marijuana in fake incoming legal mail.

10/22/2009   Suspected marijuana found in inmate incoming mail.

10/26/2009   An envelope with a card containing suspected marijuana was found in incoming mail.

11/03/2009   Staff found suspected marijuana in incoming mail.

11/13/2009   Suspected marijuana found in fake legal mail.

12/11/2009   Contraband in incoming fake legal mail discovered at time of delivery.

12/11/2009   Search of legal mail found what appeared to be marijuana between pieces of paper glued together.

01/13/2010   Staff found contraband in fake legal mail while delivering legal mail.

01/15/2010   Suspected marijuana was found in fake incoming legal mail.

02/08/2010   Staff found suspected marijuana concealed inside greeting card in incoming inmate mail.

03/02/2010   Staff found green leafy substance concealed on the back of a photo in incoming inmate mail.

03/03/2010   Staff found contraband concealed in greeting card in incoming inmate mail.

03/08/2010   Staff found brown leafy substance concealed in greeting card in incoming inmate mail.

03/11/2010   Green substance found in inmate legal mail.

03/11/2010   Green substance found in an inmate's legal mail. (2nd Incident)

04/16/2010   Staff found contraband in incoming mail, suspected marijuana.

05/26/2010   3 Pieces of dental floss were concealed between pieces of paper in incoming inmate mail, falsely marked "legal mail".

06/11/2010   During the process of opening incoming mail, staff discovered a laminated card concealed in a letter.

06/24/2010   Staff found a leafy green substance hidden in the pages of legal mail addressed to inmate Boland.

07/27/2010   Staff found three sewing needles in incoming inmate mail concealed within a greeting card.

07/28/2010   Staff found needles in incoming mail.

08/04/2010   Staff found contraband in incoming inmate mail marked legal mail when opened in presence of inmate.

09/03/2010   Inmate's incoming mail was discovered to have a dark brown substance concealed in between the pages of a father's day card.

09/09/2010   While Processing incoming inmate mail, staff found a greeting card with a green leafy substance.

09/27/2010   Staff found contraband in outgoing mail being returned to an inmate. Three $20.00 bills.

11/30/2010   Staff was processing the inmates' incoming mail and while opening an envelope for inmate English Desmond, a green substance fell out of the envelope and was suspected to be drugs.

03/09/2011   Explicit sexual photographs were mailed to inmate Jenez Hueck.

04/21/2011   Staff found a razor blade concealed within a greeting card while searching inmate's property for delivery.

07/21/2011   Incoming letter addressed to inmate Mollie Herrera contained an unknown white powdery substance.

08/16/2011   While searching 1 of 44 boxes of legal mail for inmate Ronald Knight, staff found rolling paper taped to legal papers.

### C.O.P. 929.00 Implemented September 19, 2011

09/24/2012   While searching incoming inmate legal mail in the presence of the inmate, it was discovered to be personal mail containing unauthorized photos and not from the attorney identified on the envelope.

10/04/2012   Staff located a suspicious yellow and white substance while processing incoming inmate postcards addressed to inmate Ali, Zaheer.

[See Exhibit "B" and photographs attached thereto.]

9.     The postcard only policy has resulted in a significant decrease in the introduction of contraband through the use of correspondence contained within an envelope.  It is the envelope and the need to physically open each envelope to inspect the contents of incoming mail that greatly increases the possibility that contraband will be introduced into the jail facility.  Postcards are not contained in envelopes and do not contain multi-layered cards or sheets of paper and do not have to be opened and inspected by staff.  The lack of an envelope has reduced the introduction of contraband into the jail and is less time consuming and easier to inspect and process, making it less likely, through human error, that contraband contained in an envelope will enter the facility.

[See Exhibit "B" – Affidavit of Michelle DeLaura and photographs attached thereto.]

10.     The jail facility also allows visitation with family and friends as an alternative form of communication between inmates and members of the public. [See Exhibit "C" -

C.O.P. 930.00.][3]  Furthermore, the inmates have access to telephones to make collect calls.  Telephone conversations also offer an alternative means of communication outside of the United States mail system.  Consequently, Plaintiff could have an inmate call him as an additional form of communication. [See Exhibit "D".]

---

[3]Plaintiff admits that visitation is allowed. [DE 1–Notice of Removal–Complaint, paragraph 12.]

## MEMORANDUM OF LAW

## ARGUMENT

The standard of review which must be applied by the Court as contained in Rule 56(a) of the Federal Rules of Civil Procedure reads in pertinent part as follows:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the non-moving party, in this case, the Plaintiff.  The Plaintiff is then required to come forward with sufficient evidence to rebut the showing with affidavits or other relevant and admissible evidence. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the non-moving party's burden to come forward with evidence on each essential element of his or her claim sufficient to sustain a jury verdict.  See Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11th Cir. 1990).  See also Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) [Plaintiff must produce specific facts showing that there is a genuine issue for trial.].

## 42 U.S.C. SECTION 1983 OFFICIAL CAPACITY CIVIL RIGHTS
## CLAIM AGAINST THE DEFENDANT SHERIFF RIC BRADSHAW (PBSO)

There is no dispute that this case involves the formal implementation of an official policy that limits incoming, non-privileged general mail to the use of a postcard.  The policy does not apply to legal or privileged mail. [See Exhibits "A" and "B".]  Thus, a single incident of unconstitutional behavior by a subordinate employee of the official policy making

11

authority is sufficient to bring a Section 1983 cause of action.  See e.g. Monell v. Department of Social Services, 436 U.S. 658 (1978).  It is the Defendant Sheriff's position in this case, however, that his official policy limiting incoming , non-privileged general mail to the use of a postcard is constitutional.

<u>**THE POSTCARD ONLY MAIL POLICY**</u>

The Sheriff's incoming postcard only policy does not amount to censorship or a restriction upon permissible and legitimate correspondence between members of the public and inmates.[4]  In that sense, the difference between sending a postcard and sending a letter in an envelope is limited to the amount of space available to write the intended message.  The policy does not limit the amount of postcard mail which can be sent, thus multiple postcards can be sent.  Therefore, when considering the security concerns posed by incoming mail in envelopes, the Sheriff's policy should be viewed as a limitation on the amount of paper (space) available to communicate in writing rather than a restriction on the message.  [See Exhibits "A" and "B".]

To the extent that the Plaintiff has some right, under the First Amendment applicable to state governmental action through the Fourteenth Amendment, as a free citizen, to communicate with inmates in the Palm Beach County Jail, that right is not unfettered and is not governed by the legal standard stated in the Plaintiff's Complaint, namely that the Sheriff must have a compelling government interest to implement the policy in the least restrictive manner.

As stated, the policy in question restricts incoming mail which enters the corrections

---

[4]Of course, attempts to communicate in code, make escape plans, or otherwise commit a crime, would be prohibited.

12

facility.  Courts have previously held that the issue of the constitutionality of incoming postcard only inmate mail policies requires only a finding that the policy is reasonably related to legitimate penological interests.  See United States Middle District of Florida case Ditullio v. White, Case No. 8:10-cv-294-T-26AEP (Jan. 28, 2010); Covell v. Arpaio, 662 F.Supp.2d 1146 (D. Ariz. 2009); Gieck v. Arpaio, 2008 W.L. 2604919 at *5 (D. Ariz., June 23, 2008); Gibbons v. Arpaio, 2008 W.L. 4447003 at *6 (D. Ariz., October 2, 2008); and United States Middle District of Florida case Gambuzza v. Parmenter, Case No. 8:09-CV-1891-T-17-TBM (May 28, 2010).

The Defendant recognizes that a jail does not form a barrier separating prison inmates from the protections of the Constitution, including the First Amendment.  Thornburgh v. Abbott, 490 U.S. 401, 407 (1989).  Inmates have a constitutional right to send and receive mail and the First Amendment provides protection against censorship of prisoners' correspondence.  Rodriguez v. Ames, 224 F.Supp.2d 555 (W.D.N.Y. 2002); Koutnik v. Brown, 396 F.Supp.2d 978 (W.D. Wis. 2005); Covell v. Arpaio, 662 F.Supp.2d 1146 (D. Ariz. 2009).  However, the Plaintiff here is not an inmate.  It is the Defendant's position that the constitutional analysis should be the same as it would be if the Plaintiff was an inmate as the question still involves legitimate institutional security concerns. The courts have repeatedly stated that the judiciary "is ill-equipped to deal with the difficult and delicate problems of prison management" Thornburgh, at 407.  As a result, the courts afford "considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." Id. at 407-408; see also Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

In setting the standard for review of prison or jail regulations, the Supreme Court in

Turner v. Safley, 482 U.S. 78, 89 (1987), held that when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.  The Court at pages 89 - 90 specifically noted:

> In our view, such a standard is necessary if 'prison administrators ..., and to the courts, [are] to make the difficult judgments concerning institutional operations.' Jones v. North Carolina Prisoners' Union, 433 U.S. at 128.  Subjecting the day-today judgment of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.  The rule would also distort the decision making [sic] process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand.  Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration.' Procunier v. Martinez, 416 U.S. at 407.

The Court in Turner then set forth the factors to be considered in determining the reasonableness of a particular regulation.  First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.  Second, there should be alternative means of exercising the right that remains open to prison inmates, further considering that where other avenues remain available for the exercise of the asserted right, the courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation.  Third, a court must consider the impact the accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally.  Here, the Court noted that in the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on

the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials. Finally, the Court held that the absence of ready alternatives is evidence of the reasonableness of a prison regulation and that, by the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns. The Court specifically recognized: "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." Id. at 89-90.[5]

The Supreme Court's holding in Procunier v. Martinez, 416 U.S. 396, 413-14 (1974), sets forth standards for evaluating claims of censorship of outgoing mail.[6] In that case, the Court recognized that although censorship of inmate outgoing mail may be justified under certain limited circumstances, simple efforts to eliminate unflattering or unwelcome opinions

---

[5]Applying this standard, the court in Mauro v. Arpaio, 188 F.3d 1054, 1060 (9th Cir. 1999) stated: "To show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove that the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future. Moreover, it 'does not matter whether we agree with' the defendants or whether the policy 'in fact advances' the jail's legitimate interests. The only question that we must answer is whether the defendants' judgment was 'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests." (citations omitted).

[6]Martinez has been limited by the holding of Thornburgh, supra.

15

or factually inaccurate statements would not suffice.  Even so, the Court recognized that

if corrections officials could show that substantial governmental interests of security, order,

and rehabilitation existed as it pertained to a particular regulation or act and that the

limitation of First Amendment freedoms must be no greater than is necessary or essential

to the protection of the particular governmental interest involved, the regulation would

withstand scrutiny.  In addition, the Court stated: "This does not mean, of course, that

prison administrators may be required to show with certainty that adverse consequences

would flow from the failure to censor a particular letter.  Some latitude in anticipating the

probable consequences of allowing certain speech in a prison environment is essential to

the proper discharge of an administrator's duty."  Id, at 414.  It is clear the rule of Martinez

is directed toward acts of censorship, not regulation as to the format utilized in the exercise

of the freedom of speech allowed to inmates.  Martinez offers no comment related to

restriction of the means utilized to communicate by mail where there is no effort on the part

of corrections officials to censor the content of a message; it has limited application to the

facts of this case and cannot be applied as a *per se* standard to be applied to any review

of an act or regulation related to incoming, general mail.  To the extent Martinez survives

Thornburgh, Martinez acknowledges some right that a free citizen has to receive mail from

an inmate in an uncensored manner.  Mr. Althouse, however, has no right to send any form

of communication he chooses into a jail facility.  In addition, the Sheriff's policy only restricts

incoming mail for security reasons.

Courts have addressed the issue of postcard only regulations in the context of

incoming mail.  In Covell v. Arpaio, 662 F.Supp.2d 1146 (D. Ariz. 2009), a prisoner held in

the county jail brought an action claiming that the sheriff violated his First Amendment

rights by instituting a policy that restricted incoming mail to metered postcards.  The court, of course, recognized the rights of inmates under the First Amendment to send and receive mail, but also recognized that these rights are limited by the fact of incarceration and they may be curtailed to achieve legitimate correctional goals.  The court applied the test set forth in Turner v. Safley, recognizing that the standard is deferential to the professional judgment of prison administrators.  The court then looked at the four factors individually.

As to the first prong, the court concluded that there was a rational connection to a legitimate governmental interest in the regulation: jail security.  The court noted that when the inmate does not present enough evidence to refute a common sense connection between the prison regulation and the objective that the government argues the policy is designed to further, then the first prong of the Turner test is satisfied.  The court concluded the second prong was satisfied because the alternative means of exercising the right at issue, such as metered postcards, telephones and jail visits, although all less than ideal, were sufficient.  Alternatives provided by the jail need not be ideal, only available.  In terms of the third prong, the adverse impact of accommodation, the court noted that eliminating stamped mail allowed the jail's limited security staff to devote more time to prison security assignments.  Here, the court again noted the deference to the informed discretion of correction officials.  Finally, the court found that the plaintiff failed to meet the burden of showing that there were obvious or easy alternatives to the regulation or that it constituted an exaggerated response, particularly that there was a way to accommodate the right at a *de minimis* cost to the valid penological purpose.

In addition, the United States District Court for the Middle District of Florida has dismissed a complaint filed by an inmate challenging a postcard only regulation applied to

17

incoming mail in the Manatee County Jail.  The court cited to the limitation of privileges and rights that accompanies incarceration and the need to strike a balance between the rights of prisoners and the discretion given prison administrators to govern the order and security of a corrections facility.  The court found the postcard only policy to be reasonably related to legitimate penological interests. Gambuzza v. Parmenter, 8:09-cv-1891-T-17TBM (M.D. Fla. 2010).  Although the cases which address the constitutionality of incoming general mail postcard only policies involved inmate Plaintiffs, it follows that these opinions equally apply to non-inmate citizens who seek to send mail to an inmate.  Obviously the opinions of courts that have held that an incoming postcard only mail policy is constitutional have applied equally to the persons sending the mail into the facility as well as to the inmates receiving it.  This is true despite the fact that the citizen sending the mail was not a party. It would be impossible to have a policy that would allow Plaintiff to send mail in envelopes into the jail and yet forbid the inmate from receiving it unless it was a postcard.

In the instant case, the legitimate penological interests are obvious.  First, incoming envelopes containing multiple pages of paper or multi-fold greeting cards presents a significant opportunity to introduce contraband into the jail.[7]  Second, the amount of jail staff time that is taken up in opening and inspecting mail in envelopes exceeds the time that is necessary to inspect postcards.  Finally, the inspection of a postcard, rather than a sealed envelope, increases the likelihood that staff will discover an attempt to introduce contraband into the jail facility, as the jail receives thousands of incoming mail pieces monthly. [See Exhibit "B".]

---

[7]Furthermore, this attempt can be anonymous through the use of fictional return addresses and names.

In <u>Koutnik v. Brown</u>, 396 F.Supp.2d 978 (W.D. Wis. 2005), a prison inmate sued alleging that his First Amendment rights were violated when he was prevented from mailing a letter that contained a drawing believed to contain encoded references to gang activities. The court granted summary judgment.  In doing so, the court recognized that the First Amendment provided protection against censorship of prisoner's incoming and outgoing correspondence, but also that legitimate governmental interest may justify the imposition of certain restraints on inmate correspondence.  The court noted the two different standards that have been utilized distinguishing between incoming inmate mail and outgoing inmate mail and that a less deferential standard applies to the censorship of outgoing prisoner mail.  The court cited to <u>Thornburgh v. Abbott</u>, <u>supra</u>, and <u>Procunier v. Martinez</u>, <u>supra</u>, for the proposition that corrections officials must show that the regulation or practice in question furthers an important or substantial governmental interest *unrelated to the suppression of expression* and that the limitation of the First Amendment freedoms is no greater than necessary or essential to protect a particular governmental interest involved.  The less deferential analysis was applied because the implications for prison security with <u>outgoing</u> correspondence are of a lesser magnitude than the implications for incoming materials.  Even applying this standard, the court held that it should not unduly limit the discretion of prison officials in rejecting outgoing mail and should ask only whether the restrictions are generally necessary to protect the interest at stake.

This case is unusual because the Plaintiff is not an inmate.  This case also involves the limitations of incoming mail, not outgoing mail.  Therefore, there is no reason to apply a different federal constitutional analysis to the issues raised then is required by <u>Turner</u>. This case does not invoke censorship of inmate, outgoing mail and rather, involves security

concerns posed by incoming mail, which otherwise is not limited in quantity.  In <u>Perry v. Secretary, Florida Department of Corrections</u>, 664 F.3d 1359 (11th Cir. 2011), the Eleventh Circuit Court affirmed summary judgment in favor of the Defendant, applying the <u>Turner</u> reasonableness standard where the Plaintiff in that case was not an inmate.

Finally, the Plaintiff's Complaint alleges that his rights as found in Florida's Constitution have been violated. [Article I, Section 4 – <u>see</u> DE1–Notice of Removal – Complaint, paragraph 16.]  To the extent Plaintiff has such a right, it mirror's Plaintiff's rights, if any, as found in the First Amendment to the United States Constitution.  Because the Sheriff's incoming postcard only inmate mail policy is reasonably related to legitimate penological concerns, the Plaintiff's rights, if any, under Florida's Constitution have not been violated.

In <u>Simon v. Celebration Company, et.al.</u>, 883 So.2d 826 (Fla. 5th DCA 2004), the court affirmed dismissal of Count II of the Plaintiff's Complaint which sought declaratory relief under Florida law, alleging a violation of Article IX, Section 1 of Florida's Constitution. The court in <u>Simon</u> found that a constitutional provision must be self executing in order to create a private cause of action, citing <u>Tucker v. Resha</u>, 634 So.2d 756 (Fla. 1st DCA 1994). The court went on to note that the test for determining whether a constitutional provision should be construed as self executing or not self executing, depends upon whether the constitutional provision lays down sufficient rules such that the right may be determined or enjoyed or protected without the aid of legislative enactment, citing <u>Gray v. Bryant</u>, 125 So.2d 846 (Fla. 1960).  The court in <u>Simon</u> went on to conclude that Article IX, Section 1 is not self executing because the language leaves too many issues unresolved.  The same can be said for the provision of Florida's Constitution [Article I, Section 4] upon which the

Plaintiff, Mr. Althouse, relies.  This section of Florida's Constitution is not self executing.
See also Fernez v. Calbrese, 760 So.2d 1144 (Fla. 5th DCA 2000).

In addition, Plaintiff seeks, in his declaratory judgment claim, "further relief as the Court deems appropriate".  To the extent Plaintiff seeks unspecified monetary damages, courts in Florida have recognized that Florida's Constitution does not provide for a private cause of action included within Florida's waiver of sovereign immunity in the form of a state constitutional tort.  Resha v. Tucker, 670 So.2d 56 (Fla. 1996); Garcia v. Reyes, 697 So.2d 549 (Fla. 4th DCA 1997).

The motion should be granted.


**I HEREBY CERTIFY** that I have electronically filed a copy of the forgoing with the Clerk of the Court by using the CM/ECF system, and that a copy of the foregoing has been furnished by U.S. mail to **RICHARD CLYDE ALTHOUSE, Pro Se Plaintiff**, 505 ½ Plymouth Road, West Palm Beach, Florida 33405 this 25th day of October, 2012.


  *s/Richard A. Giuffreda*
RICHARD A. GIUFFREDA, ESQUIRE
Fla. Bar No. 705233
PURDY, JOLLY, GIUFFREDA & BARRANCO, P.A.
2455 E. Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida  33304
Telephone:   (954) 462-3200
Facsimile:    (954) 462-3861
e-mail:        richard@purdylaw.com
Attorney for *Defendant SHERIFF*
Trial Counsel

21